# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARGARET CULLINAN,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

    Defendant.

No. 15 C 11499

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Margaret Cullinan filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq, 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gain-

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq.

ful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on February 28, 2012, alleging that she became disabled on May 3, 2012, because of vision problems, side effects from stroke, diabetes, balance problems, cysts on cervix, and fatigue. (R. at 12, 189–92, 198–203, 218, 222). The applications were denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 12, 87–88, 117–18, 148–52). On April 9, 2014, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 12, 32–62). The ALJ also heard testimony from Jacqueline R. Bethell, a vocational expert (VE). (*Id.* at 12, 56–62, 178–79).

The ALJ denied Plaintiff's request for benefits on May 14, 2014. (R. at 12–26). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since May 3, 2011, the alleged onset date. (*Id.* at 14). At step two, the ALJ found that Plaintiff's depression and generalized anxiety disorders are severe impairments. (*Id.* at 14). The ALJ also found that Plaintiff's status post hysterectomy, diabetes mellitus, and obesity are nonsevere impairments. (*Id.* at 14–15). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 15–17).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she can perform light work, except

> no climbing of ladders, ropes, or scaffolds. [Plaintiff] is limited to no exposure to dangerous moving machinery like a forklift, and no driving as part of the job duties. [Plaintiff] cannot perform work that involves detailed or complex instructions or tasks. She can maintain sufficient concentration, persistence, or pace to appropriately and timely complete routine tasks. The work should involve simple instructions, simple work-related decisions, and occasional changes in the work place setting.

(R. at 17). At step four, the ALJ determined that Plaintiff is unable to perform any past relevant work. (*Id.* at 25). Based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including laundry aide, cleaner/polisher, and marker/labeler. (*Id.* at 25–26). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the Act. (*Id.* at 26).

The Appeals Council denied Plaintiff's request for review on April 21, 2014. (R. at 1–6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

# III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is

weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

On May 3, 2011, Plaintiff received hospital treatment after suffering with a headache and blurry vision in her right eye the previous week. (R. at 342). A CT scan indicated a possible occipital stroke. (*Id.*). She was released on May 6 with no physical restrictions. (*Id.* at 314). During a follow-up examination a month later, Plaintiff had no weakness, was able to walk normally, and had full strength and range of motion in her extremities. (*Id.* at 336–37). By February 2012, her vision had improved. (*Id.* at 373).

On October 12, 2011, George R. Cybulski, M.D., Plaintiff's neurosurgeon, completed a Medical Source Statement. (R. at 285–90). He opined that Plaintiff can only occasionally lift and carry 10 pounds. (*Id.* at 285). During a workday, Plaintiff needs a cane to ambulate and can sit, stand, or walk only up to one hour each workday and would need to lie down the rest of the day. (*Id.* at 286). Plaintiff can never reach and only occasionally handle, finger, feel, or push/pull. (*Id.* at 287). She can never climb, balance, stoop, kneel, crouch, or crawl. (*Id.* at 288). Plaintiff has blindness in

her right eye which prevents her from reading books and computer screens, and she cannot tell the difference in shape and color of small objects. (*Id.*). Plaintiff is unable to perform activities of daily living on her own, including shopping, travelling, walking, preparing simple meals, and personal hygiene. (*Id.* at 290).

On August 25, 2012, Michael E. Stone, Psy.D., reviewed the medical record and performed a mental status consultative examination on behalf of the Agency. (R. at 423–26). Plaintiff stated that she is unable to work because she suffers from stroke, vision problems, balance problems, diabetes, cysts on cervix, depression, anxiety, and panic attacks. (*Id.* at 423). She reported taking Metformin, Zoloft, naproxen, Combivent, sertraline, aspirin, lovastatin, and zolpidem.[3] (*Id.*). She denied suicidal ideation or any problematic use of drugs or alcohol. (*Id.*). She reported receiving assistance from her family with daily living activities, including cooking, shopping, transportation, and money management. (*Id.*). She became tearful and tense during the evaluation. (*Id.* at 424). Upon examination, Plaintiff did not exhibit mood lability or manic symptoms. (*Id.*). She was alert, oriented, compliant, and reasonably responsive. (*Id.*). Her affect was depressed; her mood was anxious, irritable, and dysthymic; and she related feelings of hopelessness, helplessness, and anhedonia. (*Id.*).

---

[3] Metformin is an oral diabetes medicine that helps control blood sugar levels. Zoloft (sertraline) is a serotonin reuptake inhibitor that is used to treat depression, panic disorder, and anxiety disorders. Aleve (naproxen) is a nonsteroidal anti-inflammatory drug (NSAID) that is used to treat pain or inflammation. Combivent is a metered-dose inhaler containing a combination of albuterol and ipratropium that relax muscles in the airways and increase air flow to the lungs. Mevacor (lovastatin) is used to lower the risk of stroke, heart attack, and other heart complications in people with diabetes, coronary heart disease, or other risk factors. Ambien (zolpidem) is used to treat insomnia. <www.drugs.com> (last visited December 5, 2016).

Dr. Stone found that Plaintiff's thought content was positive for depression, anxiety, and panic attacks. (*Id.*). Her thought process was logical and sequential. (*Id.*). Dr. Stone concluded that Plaintiff exhibited no significant impairment in her ability to perform calculations and in her general fund of knowledge. (*Id.* at 425–26). She exhibited adequate judgment but had difficulties with abstract thinking. (*Id.* at 426). Dr. Stone concluded that Plaintiff has low average intelligence and is unable to manage her own funds. (*Id.*). He diagnosed depression secondary to medical problems and generalized anxiety disorder with panic attacks and opined that her prognosis is guarded. (*Id.*).

On the same day, Albert Osei, M.D., performed an Internal Medicine Consultative Examination on behalf of the Agency. (R. at 428–32). Plaintiff reported depression and anxiety since her stroke and complained of a lack of peripheral vision in her right eye but denied bumping into objects. (*Id.* at 428–29). On examination, Dr. Osei found her alert and oriented to place, time, and date; affect was normal; and she had no obvious signs of depression, agitation, irritability, or anxiety. (*Id.* at 432). Dr. Osei confirmed a loss of right lateral visual field but Plaintiff's visual acuity was 20/40 in both eyes. (*Id.* at 430). She had a normal gait and sensation, full range of motion, normal strength and reported no problems with standing, sitting, or bumping into objects. (*Id.* at 431). Dr. Osei diagnosed history of cerebrovascular accident, diabetes mellitus, depression, and anxiety, and concluded that Plaintiff can handle her own funds. (*Id.*).

On September 27, 2012, Phyllis Brister, Ph.D., a nonexamining DDS consultant, reviewed the medical record and concluded that Plaintiff has moderate difficulties in maintaining concentration, persistence or pace. (R. at 68–69). Dr. Brister opined that Plaintiff is moderately limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public. (*Id.* at 70–71). On March 8, 2013, David Gilliland, Psy.D., affirmed Dr. Brister's opinion but also found that Plaintiff has moderate limitations in maintaining social functioning. (*Id.* at 95–99).

In October 2012 and January 2013 examinations, Plaintiff had normal sensation, range of motion and strength in her lower extremities, and her gait was normal. (R. at 444, 446, 448).

Plaintiff began treating with John N. Canzona, Psy.D., on February 5, 2013. (R. at 555). Plaintiff complained that the stroke has ruined her life; she cannot work, she had to move back in with her parents, who have threatened to take her to a shelter, she has lost her right peripheral vision, and has decreased balance from the stroke as well as fatigue from her medications. (*Id.* at 555–56). She remains in her bedroom all day and watches television. (*Id.* at 556). She has trouble sleeping and has frequent nightmares. (*Id.*). On examination, Plaintiff had a sad and angry affect, a sad and depressed mood, fair to poor insight, fair to good judgment, and fair motivation. (*Id.* at 558). Dr. Canzona assessed Plaintiff as a moderate suicide risk. (*Id.*). He diagnosed major depressive disorder, recurrent and moderate, with a need to rule out adjustment disorder with depressed mood, which is aggravated by fami-

ly, occupational, and economic factors, and assigned a Global Assessment of Functioning (GAF) score of 55.[4] (*Id.* at 558–59).

On March 12, Plaintiff reported continuing family stresses and unhappiness with being unable to work and losing her apartment. (R. at 545). On examination, she was fully oriented with adequate attention and concentration. (*Id.* at 547). Her affect ranged from anxious to sad to frustrated; her mood was depressed and frustrated; insight was fair to poor; and judgment was fair. (*Id.*). On March 26, Plaintiff reported episodic conflicts with her mother. (*Id.* at 541). She lost all of her possessions except for her pet bird when her roommate evicted her from the house where she was living. (*Id.*). On examination, she was fully oriented with adequate attention and concentration, and her thinking was coherent and relevant with no delusions. (*Id.* at 543). Her affect ranged from sad to frustrated; her mood was depressed and frustrated; her insight was fair to poor; and her judgment was fair. (*Id.*). Dr. Canzona assessed her suicide risk as minimal. (*Id.*). On April 9, Plaintiff reported multiple family stressors causing her to feel depressed. (*Id.* at 524). On examination, she was fully oriented with adequate attention and concentration, and her thinking was coherent and relevant with no delusions. (*Id.* at 526). Her affect ranged from sad to frustrated; her mood was depressed and frustrated; her insight was fair to poor; and her judgment was fair. (*Id.*). On May 7, Plaintiff reported con-

---

[4] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM–IV*). A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

tinuing conflicts with her parents and siblings, insomnia, and poor balance. (*Id.* at 500).

On May 10, 2013, Plaintiff complained of fatigue, pain, worsening depression, insomnia, and increased anxiety. (R. at 620). On examination, Plaintiff had a depressed mood and affect. (*Id.* at 622). Regina Hall-Ngorima, M.D., diagnosed insomnia and an adjustment disorder with depressed mood—which she opined was "worsening"—and assigned a GAF score of 65. (*Id.*). Dr. Hall-Ngormia increased Zoloft to 150 mg, continued lorazepam,[5] and referred Plaintiff to a sleep clinic. (*Id.*).

On August 27, Plaintiff reported her family situation was improving. (R. at 706). Dr. Canzona found she was less depressed and frustrated, but her insight was fair to poor and her judgment was fair. (*Id.* at 708). On September 24, Plaintiff reported no major family conflicts and was anticipating attending a concert with her sister. (*Id.* at 702). On examination, she was fully oriented with adequate attention and concentration, and her thinking was coherent and relevant with no delusions. (*Id.* at 704). Her affect ranged from sad to angry/frustrated; her mood was depressed and frustrated; her insight was fair to poor; and her judgment was fair. (*Id.*). On October 8, Plaintiff reported multiple family stressors, including the challenges of helping her seriously ill cousin. (*Id.* at 692). On examination, she was fully oriented with adequate attention and concentration, and her thinking was coherent and relevant with no delusions. (*Id.* at 694). Her affect ranged from sad to frustrated; her mood

---

[5] Ativan (lorazepam) is used to treat anxiety disorders. <www.drugs.com> (last visited December 5, 2016).

was depressed and frustrated; her insight was fair to poor; and her judgment was fair. (*Id.*).

On October 11, a psychiatric examination by Dr. Hall-Ngorima was largely unremarkable. (R. at 689). She opined that Plaintiff's course of treatment was stable and improving. (*Id.* at 690). Dr. Hall-Ngorima continued Zoloft and lorazepam and recommended that she continue her therapy sessions with Dr. Canzona. (*Id.*). On October 22, November 5 and December 3, Plaintiff reported continuing family stressors and occasional medication abuse. (*Id.* at 648, 679, 683). On examination, she was fully oriented with adequate attention and concentration, and her thinking was coherent and relevant with no delusions. (*Id.* at 650, 681, 685). Her affect ranged from sad to frustrated; her mood was depressed and frustrated; her insight was fair to poor; and her judgment was fair. (*Id.*).

On November 15, 2013, Plaintiff presented with an altered gait, right-sided weakness, and an inability to walk. (R. at 656–57, 662, 673). On examination, her cranial nerves were grossly intact, her gait was slow with a walker, and she had 4/5 strength in all limbs. (*Id.* at 675). Otherwise, she had normal range of motion and strength. (*Id.* at 667). After examination, the evaluating physician concluded that somatization was the likely cause of her symptoms and prescribed Trazodone.[6] (*Id.* at 662). By January 2014, Plaintiff's gait and balance were normal. (*Id.* at 740–42).

---

[6] Trazodone is used to treat major depressive disorder. <www.drugs.com> (last visited December 5, 2016).

On December 17, Dr. Canzona summarized Plaintiff's psychiatric problem as moderate, episodic depression, which is exacerbated by emotional stress and relieved with counseling, medication and stress reduction. (R. at 642). Plaintiff reported anxiety when attending her cousin's memorial service and her parents' fiftieth anniversary reception. (*Id.* at 643).

On January 15, 2014, Lorena Monterubianesi, M.D., after treating Plaintiff on a quarterly basis since May 2011, completed a Medical Evaluation Report for the State of Illinois Department of Human Services. (R. at 739–42). Dr. Monterubianesi reported that Plaintiff's balance issues were "back to normal." (*Id.* at 740). She opined that Plaintiff has the full capacity to walk, bend, stand, stoop, sit, turn, push, pull, manipulate, and finger. (*Id.* at 742). She has 20–50% reduced capacity to climb and travel on public transportation. (*Id.*). Plaintiff also has up to a 20% reduced capacity to perform activities of daily living. (*Id.*). Dr. Monterubianesi concluded that Plaintiff can lift no more than 20 pounds at a time with frequent lifting up to 10 pounds. (*Id.*).

On April 8, 2014, Dr. Canzona completed a Medical Source Statement. (R. at 820–21). He concluded that Plaintiff's stroke has affected her cognitive abilities and her history of anxiety and depression restricts her ability to perform work-related functions. (*Id.*). He opined that Plaintiff has no useful ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, work with or near others without being distracted by them, make simple work-related decisions, complete a normal workday or workweek, per-

form at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, or travel in unfamiliar places or use public transportation. (*Id.*). He also opined that Plaintiff can only sometimes remember locations and work-like procedures, understand and remember short, simple instructions, perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, ask simple questions or request assistance, or set realistic goals or make plans independently of others. (*Id.*).

Plaintiff testified that she is unable to work because after her stroke, she lost peripheral vision in her right eye. (R. at 41–42). Although new glasses help maintain her balance, she still stumbles several times a week. (*Id.* at 42–44). She also suffers from depression and anxiety; she gets nervous and won't leave the house. (*Id.* at 44). Her therapist and medications have helped her to cope. (*Id.* at 45). She gets tired and groggy from her medications and needs to take frequent naps. (*Id.* at 45–47). She has trouble falling asleep at night. (*Id.* at 48). She also gets debilitating headaches about once a week. (*Id.* at 55).

Plaintiff further testified that her stroke caused right-sided weakness in her legs. (R. at 54). She can stand only 20 minutes before needing to sit and can walk only a half block before needing to rest. (*Id.* at 46–47). She can sit for 40 minutes before needing to change positions. (*Id.* at 47). She is able to help with some household chores, including laundry, making the bed, washing the dishes, and light cook-

ing. (*Id.* at 48–50, 53). She denied doing much socializing outside of her immediate family. (*Id.* at 50–51).

## V. DISCUSSION

Plaintiff argues that the ALJ failed to properly consider (1) the opinions of her treating physicians, (2) Plaintiff's credibility, and (3) Plaintiff's limited vision in determining her RFC.

### A. Substantial Evidence Supports Weight Given to the Treating Physicians' Opinions

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by

substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

### 1. Dr. Cybulski

Shortly after Plaintiff's stroke, her treating neurosurgeon completed a Medical Source Statement. (R. at 285–90). Dr. Cybulski opined that because of blindness in her right eye and weakness in her right arm and leg, Plaintiff cannot work a full day, must frequently lie down, requires a cane to ambulate, can never reach, stoop, operate foot controls, read small print, and can only occasionally handle, finger, feel, push, and pull with her dominant right hand. (*Id.*).

In her decision, the ALJ gave no weight to Dr. Cybulski's opinion, finding it was

> inconsistent with the generally normal examination findings discussed above, and is inconsistent with [Plaintiff's] own reported activities of daily living. For instance, [Plaintiff] was able to attend concerts which required standing and walking of more than 1 hour at a time before she was required to lie down. Additionally, she was able to ambulate independently to all appointments other than an emergency visit in November 2013, which is inconsistent with Dr. Cybulski's opinion that she can ambulate no feet without a cane.

(R. at 24) (citation omitted).

The ALJ's reasons for giving no weight to Dr. Cybulski's opinion are supported by substantial evidence. First, the ALJ accurately noted that Dr. Cybulski had not seen Plaintiff since her 2011 stroke (R. at 24), and thus did not have the detailed

and longitudinal view that generally gives treating source opinions significant weight. 20 C.F.R. § 404.1527(c)(2) ("we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)"); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It would be exceedingly illogical to credit a doctor's opinion because he is *more likely* to have a detailed and longitudinal view of the claimant's impairments when *in fact, there is no detail or longitudinal view*.") (emphasis in original).

Second, Dr. Cybulski's opinion was inconsistent with the medical evidence. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (inconsistencies between a physician's opinion and the medical records is an appropriate reason for rejecting the opinion). While Dr. Cybulski found that the stroke left Plaintiff blind in her right eye, the ALJ noted that she otherwise retained 20/40 vision. (R. at 19, 21) (citing *id.* at 430, 779, 781). And except for an emergency room visit in November 2013 when Plaintiff requested a walker, Plaintiff was able to independently ambulate without any assistive devices. (*Id.* at 19, 20, 24; *see e.g.*, *id.* at 431, 444). The ALJ also noted that Plaintiff denied weakness in June 2011 and multiple examinations found that she had normal sensation, range of motion, and strength in her extremities. (*Id.* at 18–20) (citing *id.* at 314, 336–37, 428, 431–32, 444, 446, 448).

Finally, Dr. Cybulski's opinion was inconsistent with Plaintiff's description of her daily activities. The ALJ properly noted that Plaintiff's self-professed ability to perform household chores, attend concerts, go on dates, and care for her cousin at a

nursing home is inconsistent with Dr. Cybulski's opinion that Plaintiff can sit or stand for only one hour in an eight-hour workday. (R. at 22, 24) (citing *id.* at 524, 563, 577, 648–49, 692).

In sum, the ALJ's decision giving no weight to Dr. Cybulski's opinion is supported by substantial evidence. A reasonable person could find that the medical record and Plaintiff's reported daily activities belied Dr. Cybulski's opinion that Plaintiff must frequently lie down, cannot work a full day, and requires a cane to ambulate.

### 2. *Dr. Canzona*

In April 2014, Dr. Canzona, Plaintiff's treating psychologist, completed a Medical Source Statement. (R. at 820–21). He concluded that Plaintiff's stroke has affected her cognitive abilities and her history of anxiety and depression restricts her ability to perform work-related functions. (*Id.*). He opined that Plaintiff is markedly limited in her ability to understand, remember and carry out instructions, and in her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting. (*Id.*).

In her opinion, the ALJ gave no weight to Dr. Canzona's opinion, finding that

> his opinion is not supported by his own treatment notes, [Plaintiff's] activities, or GAF scores discussed above. For instance, Dr. Canzona opined that [Plaintiff] has poor ability to travel in unfamiliar places or use public transportation, however treatment notes state that she was attending concerts, attending her sisters [*sic*] Halloween party, and was going on dates. Additional opinion that she has poor abilities to perform many other work activities such as perform at a consistent pace or maintain attention and concentration are inconsistent with generally adequate concentration and attention on examination, noted above.

(R. at 24) (citation omitted).

The ALJ's reasons for giving no weight to Dr. Canzona's opinion are supported by substantial evidence. The ALJ accurately noted that the opinion was inconsistent with his own treatment notes. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015) (internal inconsistencies "provide good cause to deny controlling weight to a treating physician's opinion"). For example, Dr. Canzona's opinion that Plaintiff has *no useful ability* to maintain attention and concentration for extended periods or perform at a consistent pace is inconsistent with his own treatment notes that consistently indicated only mild to moderate restrictions in attention and concentration. (R. at 16, 22–23) (citing *id.* at 494, 508, 543, 547, 587, 689). Dr. Canzona's opinion that Plaintiff has limited social functioning and has *no useful ability* to travel in unfamiliar places or use public transportation is contradicted by his own treatment notes which indicated that Plaintiff had no qualms about attending concerts and parties, or going on dates. (*Id.* at 24) (citing *id.* at 577, 648, 683, 702). And Dr. Canzona's GAF score of 55 indicates only moderate symptoms not the disabling conclusions found in his opinion. (*Id.* at 16, 20, 22, 24) (citing *id.* at 494–95, 541, 545). The ALJ also noted that the consultative examination findings were generally normal with no significant impairment in Plaintiff's ability to perform calculations, comparisons, or other aspects of memory and concentration. (*Id.* at 16, 22) (citing *id.* at 425); *see Ketelboeter*, 550 F.3d at 625 ("[I]f the treating physician's opinion is inconsistent with the consulting physician's opinion, . . . the ALJ may discount it.").

In sum, the ALJ's decision giving no weight to Dr. Canzona's opinion is supported by substantial evidence. A reasonable person could find that Dr. Canzona's

treatment notes and examinations and Plaintiff's activities belie his opinion that Plaintiff has marked limitations in her ability to perform many work-related functions.

### 3. Other Opinions

Plaintiff also criticizes the weight given by the ALJ to the opinions of Drs. Brister, Gilliland, and Monterubianesi, arguing that the ALJ's reasoning is inconsistent. (Dkt. 16 at 12–13). After careful review, the Court disagrees.

The ALJ gave great weight to Dr. Brister's opinion, noting that she "provided a mental [RFC] that is consistent with [the ALJ's RFC] assessment." (R. at 24). Plaintiff contends that this indicates the ALJ "made up her mind about RFC before considering Dr. Brister's opinion, which was improper." (Dkt. 16 at 12). But Plaintiff provides no support for her contention that the ALJ failed to consider all the evidence before assigning weight to Dr. Brister's opinion. And there is no prohibition on the ALJ relying on the opinions of nonexamining doctors. *See Collins v. Barnhart*, 114 F. App'x 229, 233 (7th Cir. 2004) (ALJ "appropriately relied on the nonexamining source opinion"); *Ronning v. Colvin*, No. 13 CV 8194, 2015 WL 1912157, at *5 (N.D. Ill. Apr. 27, 2015) (ALJ may reasonably rely on DDS report); Social Security Ruling (SSR)[7] 96-6p, at *3 (opinions from state-agency doctors may be entitled to

---

[7] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

the most weight). Plaintiff also contends that Dr. Brister's opinion is internally in-consistent—she found Plaintiff has mild difficulties in maintaining social function-ing but is moderately limited in her ability to interact appropriately with the gen-eral public. (R. at 80, 83). But because Dr. Brister found no limits to Plaintiff's abil-ity to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers with-out distracting them or exhibiting behavioral extremes, and maintain socially ap-propriate behavior and adhere to basic standards of neatness and cleanliness, she reasonably concluded that Plaintiff's overall social limitations were only mild. (*Id.*).

The ALJ also gave great weight to the opinion of Dr. Gilliland, another nonex-amining, state-agency physician, but rejected his finding of moderate difficulties in maintaining social functioning, finding it inconsistent with the treatment records and Plaintiff's own reported activities. (R. at 24). Plaintiff contends that the ALJ failed to specify which treatment records were inconsistent. (Dkt. 16 at 13). To the contrary, as described above, the ALJ found that Plaintiff's ability to attend con-certs, parties and a wake, go on dates, care for an elderly cousin and grandmother, volunteer at an animal shelter, and help a friend with foster children indicates at most a mild limitation in social functioning. (R. at 22–23) (citing *id.* at 524, 563, 577, 643, 648, 679, 692, 702, 705).

The ALJ gave controlling weight to the opinion of Dr. Monterubianesi that Plaintiff was limited to light work with no restrictions on standing, walking, or sit-ting. (R. at 24; *see id.* at 739–42). Plaintiff argues that the "allocation of 'little

weight' to [Dr.] Gilliland's finding of moderate difficulties in social functioning was inconsistent with the controlling weight the ALJ gave to Dr. Monterubianesi's opinion that Plaintiff was twenty to fifty percent reduced in her ability to take public transportation." (Dkt. 16 at 13). There is no contradiction. Dr. Monterubianesi's opinion was limited to her physical limitations; indeed, she explicitly expressed no opinion on whether Plaintiff's mental impairments cause any functional limitations. (R. at 742). Thus, the ALJ's acceptance of Dr. Monterubianesi's opinion on Plaintiff's *physical* impairments is not inconsistent with her rejections of Dr. Canzona's opinion that Plaintiff's *mental* impairments cause moderate difficulties in maintaining social functioning.

## B. The ALJ's Credibility Determination is Not Patently Wrong

The Social Security Administration determined recently that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the claimant's] symptoms." SSR 16-3p, at *2. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is

an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3p, at *2.

In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 16-3p, like former 96-7p, requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating

or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Id.*

Plaintiff testified that she is unable to work because of limited vision in her right eye. (R. at 41–42). Although new glasses help maintain her balance, she still stumbles several times a week. (*Id.* at 42–44). She also suffers from depression and anxiety; she gets nervous and won't leave the house. (*Id.* at 44). Plaintiff also testified to right-sided weakness in her legs. (*Id.* at 54). She can stand only 20 minutes before needing to sit and can walk only a half block before needing to rest. (*Id.* at 46–47). She can sit for 40 minutes before needing to change positions. (*Id.* at 47). She is able to help with some household chores, including laundry, making the bed, washing the dishes, and light cooking. (*Id.* at 48–50, 53). She denied doing much socializing outside of her immediate family. (*Id.* at 50–51).

In her decision, the ALJ found that Plaintiff's allegations "are not entirely credible." (R. at 18). Specifically, the ALJ found Plaintiff "not credible based on her gen-

erally normal examination with mild to moderate GAF score assessments, general stability on medication and therapy, continued activities of daily living, and other factors discussed throughout the decision." (*Id.* at 23; *see id.* at 18–23).

Plaintiff contends that the ALJ inappropriately equated her daily activities with an ability to work full time. (Dkt. 16 at 14). An ALJ cannot rely on evidence of daily activities to determine that a claimant is capable of returning to work. *Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014). However, there is a critical distinction between the ALJ improperly finding that "a person's ability to perform daily activities . . . translate[s] into an ability to work full-time," *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), and the ALJ properly concluding that "the amount of daily activities [the claimant] performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in [the claimant's] medical records regarding her ability to engage in activities of daily living undermined [her] credibility when describing her subjective complaints of pain and disability," *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013).

Here, the ALJ properly limited her analysis to concluding that Plaintiff's daily activities undermined her testimony. The ALJ found that Plaintiff's ability to attend concerts, parties and a wake, go on dates, care for an elderly cousin and grandmother, volunteer at an animal shelter, and help a friend with foster children undermines her testimony that she does not like to leave the house and has to lie down for most of the day. (R. at 22–23) (citing *id.* at 524, 563, 577, 643, 648, 679, 692, 702, 705).

The ALJ also cited to objective evidence demonstrating that Plaintiff has full range of motion and strength in her legs and walks with a normal gait. Except for an emergency room visit in November 2013 when Plaintiff requested a walker, Plaintiff was able to independently ambulate without any assistive devices. (R. at 19, 20, 24; *see e.g.*, *id.* at 431, 444). The ALJ also observed that Plaintiff denied weakness in June 2011, and multiple examinations found that she had normal sensation, range of motion, and strength in her extremities. (*Id.* at 18–20) (citing *id.* at 314, 336–37, 428, 431–32, 444, 446, 448). The GAF scores of 55–65 indicate only mild to moderate symptoms. (*Id.* at 16, 20, 22, 24) (citing *id.* at 494–95, 541, 545, 622). The ALJ also noted that Plaintiff's symptoms stabilized with therapy and medication. (*Id.* at 18–22) (citing *e.g.*, *id.* at 491–95, 526–28, 545–47, 587, 687, 690); *see Sienkiewicz v. Barnhart*, 409 F.3d 798, 803 (7th Cir. 2005) ("The ALJ here adequately explained his credibility finding. He noted that Sienkiewicz's complaints of extreme pain were inconsistent with the findings of all the doctors who examined her and opined that she had only minimal or moderate limitations.").

Under these circumstances, the Court cannot conclude that the ALJ's credibility determination was patently wrong. The ALJ supported her decision with specific findings, supported by substantial evidence. *Moss*, 555 F.3d at 561.

## C. ALJ's RFC Assessment Properly Considered Plaintiff's Limited Vision

Plaintiff contends that her blurry peripheral vision is a severe impairment because it has more than a minimal impact on work-related activities. (Dkt. 16 at 10). She argues that the ALJ "failed to explain adequately why Plaintiff's blurry periph-

eral vision merely precluded Plaintiff from driving and did not reduce Plaintiff to a sedentary RFC." (*Id.*).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

As an initial matter, whether the ALJ should have included Plaintiff's limited vision—or any other malady—as a severe impairment is harmless. "[S]tep two is a threshold analysis that requires [a claimant] to show only that he has *one* severe

impairment." *Bradley v. Barnhart*, 175 F. App'x 87, 90 (7th Cir. 2006) (emphasis in original). Once the ALJ determines that one or more of a claimant's impairments are severe, the ALJ must "consider the *aggregate* effect of this entire constellation of ailments—including those impairments that in isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (emphasis in original). Thus, the ALJ's failure to include Plaintiff's limited peripheral vision as a severe impairment at step two is irrelevant. *Bradley*, 175 F. App'x at 90 ("The ALJ did find that Bradley had a severe impairment—he found, in fact, that Bradley had several severe impairments—and accordingly proceeded at step three to examine whether any of Bradley's impairments qualified as a listed impairment. It is thus irrelevant that the ALJ did not make a specific step two finding for Bradley's claims of fibromyalgia and CFS.").

After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was thorough, thoughtful, and fully grounded in the medical evidence. Reviewing the ALJ's decision "as a whole in order to give it the most sensible reading," *Carter v. Colvin*, No. 12 CV 745, 2014 WL 4825272, at *4 n.1 (S.D. Ill. Sept. 29, 2014), the ALJ appropriately considered the combined impact of Plaintiff's severe and nonsevere impairments, *see Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("we will nonetheless give the opinion a commonsensical reading rather than nitpicking at it") (citation omitted). Throughout her decision—including in the step two analysis, the ALJ acknowledged that Plaintiff has had "blurry peripheral vision in the right eye since the stroke." (R. at 14; *see id.* at 17–19, 23–24). Nev-

ertheless, the ALJ citied to medical evidence indicating that after her stroke, she was released from the hospital with "no restrictions." (*Id.* at 18) (citing *id.* at 314). Treatment notes indicate some vision impairment in the right eye, with some improvement. (*Id.* at 14, 23) (citing *id.* at 373 429, 781). The ALJ also noted a vision examination finding visual acuity at 20 feet with glasses, and 20/40 vision in both eyes. (*Id.* at 19) (citing *id.* at 429–30). In June 2013, Plaintiff denied any new vision problems. (*Id.* at 21) (citing *id.* at 779, 781).

Plaintiff contends that the ALJ failed to accommodate the lost balance and stumbling caused by her blurry peripheral vision. (Dkt. 16 at 10). To the contrary, the ALJ observed that a follow-up examination a month after her stroke indicated that Plaintiff had no weakness, was able to walk normally, and had full range of motion. (R. at 18) (citing *id.* at 314, 336–37). Moreover, multiple examinations in 2012–2013 indicated that Plaintiff had a normal gait, normal sensation, full range of motion and strength in her extremities, and she reported *no* problems with sitting, standing, or bumping into objects. (*Id.* at 19–20) (citing *id.* at 428, 431–32, 444, 446, 448). The ALJ acknowledged that in November 2013, Plaintiff reported a loss of balance and weakness in her legs, but also that she and her doctors attributed the temporary symptoms to anxiety rather than any permanent physical impairment, and by January 2014, her gait and balance were normal. (*Id.* at 21–22) (citing *id.* at 656–57, 662, 729–30, 740–42).

The ALJ accommodated Plaintiff's reduced peripheral vision and balance problems by limiting "her ability to climb, her exposure to dangerous moving machinery,

and her ability to drive." (R. at 23–24). Plaintiff does not identify any medical evidence demonstrating that further restrictions were required. *Punzio*, 630 F.3d at 712 ("The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity.").[8]

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [15] is **DENIED**, and Defendant's Motion for Summary Judgment [18] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is affirmed.

E N T E R :

Dated: December 13, 2016

_Mary M Rowland_

MARY M. ROWLAND
United States Magistrate Judge

---

[8] Without further elucidating, Plaintiff also contends that the ALJ ignored the effects that her stroke, status post hysterectomy, diabetes mellitus, obstructive sleep apnea, and obesity have on her ability to work. (Dkt. 16 at 8; Dkt. 20 at 4). Arguments that are "perfunctory, undeveloped, and unsupported by caselaw . . . are . . . waived." *Zolno v. Colvin*, No. 12 C 9511, 2014 WL 4067169, at *7 (N.D. Ill. Aug. 18, 2014); *see Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012) ("This court has repeatedly explained that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (citation omitted); *see also Punzio*, 630 F.3d at 712 ("The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity."). In any event, the ALJ did discuss, consider and analyze the impact Plaintiff's stroke, sleep apnea, obesity, diabetes, and hysterectomy have on her RFC. (R. at 14–15, 17–19, 21–23; citing *id.* at 429, 450, 545, 553–54, 779, 781, 822).